654 So.2d 624 (1995)
Robert HIGGS, Appellant,
v.
FLORIDA DEPARTMENT OF CORRECTIONS and Manuela F. Decespedes, M.D., Appellees.
No. 94-911.
District Court of Appeal of Florida, First District.
May 5, 1995.
*625 Peter M. Siegel and Randall C. Berg, Jr., Florida Justice Institute, Inc., Miami, for appellant.
J. Bruce Bowman of Dennis & Bowman, P.A., Tallahassee, for appellees.
WOLF, Judge.
Appellant, Robert Higgs, filed a medical malpractice action arising out of an injury that was allegedly improperly treated. The circuit court, Leon County, granted summary judgment in favor of the Florida Department of Corrections on the ground that the action was barred by the statute of limitations. Because we find that a genuine issue of material fact exists as to when the appellant had knowledge of an injury which may have been caused by medical malpractice, we reverse the summary judgment and remand the case.
On or about March 15, 1990, the appellant was a prisoner at Charlotte Correctional Institution. He was assaulted by another inmate and struck on the right side of the face. On the day of the assault, he went to the medical clinic. A nurse gave him an ice pack, told him to get some Tylenol at his dorm, and told him to return for sick call the next day. He reported to sick call the next day with two black eyes. His right eye was swollen shut, his mouth could not open and shut, and he had been in severe pain the previous night. Dr. Manuela Decespedes felt around his jaw area, looked into his mouth, and asked about the pain in the jaw area. During this visit, the appellant said that he believed his right cheek bone was crushed or broken.
On the same day, he saw the prison's dentist. The dentist felt around the appellant's jaw and told him nothing was broken. Then, the dentist took x-rays. There was conflicting evidence presented as to the results of the x-rays. In Dr. Decespedes' deposition, she states, recollecting the incident from the appellant's medical records, that the x-rays were negative. She states in the deposition that the dentist took x-rays, found no indication of mandibular fracture, and found swelling in the face secondary to trauma. The doctor's deposition states that the clinical exam revealed right infraorbital swelling, ecchymosis, and right facial swelling; however, in the appellant's affidavit, the appellant states that the dentist told him the x-rays did not come out, but he could tell nothing was broken.
On the evening of March 16, 1990, the appellant returned to the medical department because of the severe pain in his jaw area. A registered nurse treated him. She noted the large hematoma under his right eye, and prescribed Motrin and a soft diet. On March 21, 1990, the appellant returned to sick call and saw Dr. Decespedes. He was complaining of difficulty in getting a soft diet, continued swelling, pain, and concern over discoloration of his right lower eyelid. During this visit, appellant asked the doctor if she would take more x-rays, and she said she would not. Appellant was told to continue with a soft diet, take Ibuprofen, and return to the medical clinic in two weeks. The night following this examination, the appellant declared a medical emergency and put in a written medical request for x-rays of his face. Appellant returned to the medical clinic on April 5, 1990. He still had bruises on his right lower eyelid. While appellant continued to believe that something was wrong, Dr. Decespedes continued with the same treatment.
On May 29, 1990, the appellant was seen by Dr. Chapman. His complaints were the same as those made to Dr. Decespedes, and the same treatment was prescribed. The appellant came back to the medical department on June 27, 1990, and was given an appointment to see a doctor on July 24, 1990. On July 24, 1990, Dr. Chapman ordered facial *626 x-rays. Prior to the x-rays being taken, appellant saw the dentist, who took two bitewings and two P.A. radiographs, but still failed to find anything wrong. On May 8, May 24, and July 3, 1990, during mental health counseling, it was noted that the appellant was worried because the bruise under his right eye was not improving. Appellant states in his affidavit that although he believed something was seriously wrong, he was assured by Dr. Decespedes, the dentist, and Dr. Chapman that he would be fine and his injuries would heal in due time.
The x-ray report revealed a depression fracture of the right zygomatic arch, a fracture of the right inferior orbital rim, and a fracture of the right maxillary sinus wall. The zygomatic arch is a small bone between the eyes and the temporal. The other two fractures were in the same place, just to the side of the eye. Appellant first learned of these x-ray results on August 9, 1990, when he went to the medical clinic for other reasons. The doctor then told appellant that a plastic surgery consultation would be requested. After having consultations with different plastic surgeons and neurologists, appellant was told that he had severe facial deformity and surgery could be performed, but because of the age of the injury and the likelihood of permanent nerve damage, there was not much chance of improvement, and surgery probably would not alleviate the problem.
Appellant alleged in his complaint that appellee, the Florida Department of Corrections, was guilty of negligence. Appellant further alleged that as a result of the failure of appellee's medical staff to promptly and properly diagnose and treat his injuries, his face is permanently deformed.
Appellant contends that the statute of limitations began to run on August 9, 1990, when he first learned of the true nature of his injury. The appellee contends that it began to run on March 21, 1990, when the appellant first began to believe the medical staff was improperly treating his injury. On June 26, 1992, appellant's notice of intent to initiate medical malpractice litigation was served as required by section 766.106(4), Florida Statutes (1991), and section 768.28(7), Florida Statutes (1991). The date the statute of limitations began to run is significant because if the statute of limitations began to run on the date the appellant contends, August 9, 1990, then the notice of intent to initiate medical malpractice litigation was not untimely.
When a district court reviews a summary judgment, the court's task is to determine from the record whether a genuine issue exists as to material fact. Williams v. Roth, 622 So.2d 606 (Fla. 1st DCA 1993). The court is required to review everything in the record in a light most favorable to the position of the party moved against. Megdell v. Wieder, 327 So.2d 781 (Fla. 3d DCA 1976), cert. denied, 341 So.2d 1087 (1976). The moving party has the burden of conclusively showing the absence of genuine issues of material fact. Id.; see also Furlong v. First Nat'l Bank of Hialeah, 329 So.2d 406 (Fla. 3rd DCA 1976), cert. denied, 341 So.2d 291 (Fla. 1976). The same general rule applies as to summary judgments based on the statute of limitations in medical malpractice cases. Allen v. Orlando Regional Medical Center, 606 So.2d 665 (Fla. 5th DCA 1992), aff'd per curiam, 620 So.2d 993 (Fla. 1993); Hillsborough Community Mental Health Ctr. v. Harr, 618 So.2d 187 (Fla. 1993).
The statute of limitations for medical malpractice actions reads,
[A]n action for medical malpractice shall be commenced within 2 years from the time the incident giving rise to the action occurred or within 2 years from the time the incident is discovered or should have been discovered with the exercise of due diligence; however in no event shall the action be commenced later than 4 years from the date of the incident or occurrence out of which the cause of action accrued.
§ 95.11(4)(b), Florida Statutes (1993).[1] There has been some confusion concerning what constitutes discovery of the incident *627 under the statute. In Barron v. Shapiro, 565 So.2d 1319 (Fla. 1990), the supreme court reaffirmed a principle originally stated in Nardone v. Reynolds, 333 So.2d 25 (Fla. 1976), that the "limitation period commences when the plaintiff should have known either of the injury or the negligent act." Barron, 565 So.2d at 1322 (emphasis added). That interpretation of Nardone, however, could lead to some unjust results.[2]Tanner v. Hartog, 618 So.2d 177 (Fla. 1993), rev. denied, 632 So.2d 1028 (Fla. 1994). In Tanner, the supreme court further clarified the Nardone rule, and held that
the knowledge of the injury as referred to in the [Nardone] rule as triggering the statute of limitations means not only knowledge of the injury but also knowledge that there is a reasonable possibility that the injury was caused by medical malpractice.
Id. at 181.[3]
In Tanner, the doctor examined Mrs. Tanner on March 31, 1988, and then sent her to the hospital for testing. The following morning Mrs. Tanner's baby was delivered stillborn at the hospital. The complaint alleged that the doctors and the medical staff at the hospital were negligent in failing to promptly perform a delivery by caesarean section at a time when the child could have been saved. The Tanners filed their notice of intent to initiate litigation. However, the circuit court dismissed the complaint on the ground the two-year statute of limitations had expired. The Tanners argued that the statute of limitations began to run on the date they first realized the stillbirth was caused by medical malpractice. The health providers argued that the statute of limitations began to run on the date the Tanners knew the injury had occurred, which was the date of the stillbirth. The district court affirmed the dismissal, but the supreme court remanded the case based on its clarification of the Nardone rule. The court found that mere knowledge of a stillbirth would not necessarily suggest the possibility of medical negligence. Id. at 182.
Appellant argues that even under the Tanner test, the statute of limitations does not begin to run until the receipt of a correct diagnosis of an injury which may have been caused by medical malpractice. Appellant bases these arguments on the cases of Ash v. Stella, 457 So.2d 1377 (Fla. 1984); Dan & Sherman, M.D., v. Serrano, 578 So.2d 300 (Fla. 3d DCA 1991), rev. denied, 589 So.2d 290 (Fla. 1991); Swain v. Curry, 595 So.2d 168 (Fla. 1st DCA 1992), rev. denied, 601 So.2d 551 (Fla. 1992). In Tanner, the supreme court stated, "each of which [misdiagnosis-type cases] are at least susceptible to the interpretation that the malpractice statute of limitation does not begin to run until there is knowledge of all the elements of a completed tort, including the negligent act, the injury, and the causal connection between the two." Tanner, supra at 180. The supreme court does not specifically reject or accept this interpretation, nor does the court specifically state how to treat the statute of limitations in misdiagnosis cases. We are squarely faced with that question in the instant case.
In Martin v. Drylie, 560 So.2d 1285 (Fla. 1st DCA 1990), this court stated that a genuine issue of material fact existed as to when the statute of limitations began to run even where appellant knew of an injury but the physician had represented to appellant that the condition was temporary and would improve. It, thus, appears that the position of this court is that a misdiagnosis will constitute evidence that a plaintiff did not have knowledge that the injury was caused by negligence until the plaintiff received a correct diagnosis.[4] A misdiagnosis, therefore, would in most cases raise an issue of material fact concerning a plaintiff's knowledge thereby precluding summary judgment. Martin, supra.
*628 Applying the Tanner interpretation, including the fact that the appellant was not informed of the correct diagnosis of an injury until August 9, 1990, a genuine issue of material fact exists in the instant case as to when the appellant had knowledge of the injury and had knowledge of the reasonable possibility that the injury was caused by medical malpractice. The appellee contends that the appellant had knowledge of the injury on March 21, 1990, because he declared a medical emergency on that date and requested additional x-rays. Appellant suspected he was not receiving proper medical care, but he continued going to the medical clinic. A jury could find that his suspicion of medical misconduct may have only constituted speculation. Appellant was continually told that the injury would improve. In addition, the first sets of x-ray results did not inform him of the nature of the injury.
On March 21, 1990, the appellant only knew that something was wrong with his face. He did not know the extent of the damage to his face due to the injury, and he had not yet been given the correct diagnosis of the extent of his injury.
Based on the application of Tanner, a genuine issue of material fact exists as to when the appellant had knowledge of the injury and knowledge that there was a reasonable possibility that the injury was caused by medical malpractice. The doctor's misdiagnosis of the injury, the conflicting evidence presented as to the date when the appellant had knowledge of the injury and had knowledge that there was a reasonable possibility that the injury was caused by medical malpractice, and the allegations of continual assurances from the medical staff that the condition would get better in time are all factors which preclude entry of a summary judgment. The trial court, therefore, erred in granting the defendant's motion for summary judgment. We reverse and remand the case for further proceedings.
ERVIN and JOANOS, JJ., concur.
NOTES
[1] Additionally, under the presuit investigation requirement for medical negligence actions, a plaintiff's notice of intent to initiate litigation shall be served prior to the expiration of the statute of limitations. § 766.106(4), Fla. Stat. (1993).
[2] The injustices occurred in those cases where the party may have known of an injury, but was unaware of the extent of the injury or whether any part of the injury was the result of medical negligence.
[3] The supreme court further stated that for some cases, "[T]he nature of the injury, standing alone, may be such that it communicates the possibility of medical negligence, in which event the statute of limitations will immediately begin to run upon discovery of the injury itself." Tanner, supra at 181-82.
[4] We would note that this argument is especially appealing under the instant facts where appellant was in the custody of appellee and was not free to go and seek a second opinion.